# UNITED STATES DISTRICT COURT
for the
District of South Dakota

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE FOLLOWING FACEBOOK USER: USERNAME: "Mike L. LeHeaux"; VANITY NAME: "jaymezlonshank2deep"; AND FACEBOOK ID: 100006101828983 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | )<br>)<br>)   Case No. 5:20-mj-38<br>)<br>)<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

located in the District of _____ South Dakota _____, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §1111 & 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(B) | Murder and Conspiracy to Distribute Methamphetamine |

The application is based on these facts:

☒  Continued on the attached affidavit, which is incorporated by reference.
☐  Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.
☐ Your applicant requests that no notice be given prior to the execution of the search warrant, i.e., "no knock", the basis of which is set forth in the attached affidavit.
☐ Your applicant requests authorization to serve the search warrant any time day or night pursuant to Fed. R. Crim. P. 41(e)(2)(A)(ii), the basis of which is set forth in the attached affidavit.

_____
*Affiant Signature*
Special Agent Erik K. Doell

Sworn to before me and: ☒ signed in my presence.
☐ submitted, attested to, and acknowledged by reliable electronic means.

Date: 3-4-2020

_____
*Judge's signature*

City and state:  Rapid City, SD

Daneta Wollmann, U.S. Magistrate
*Printed name and title*

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE FOLLOWING FACEBOOK USER: USERNAME: "Mike L. LeHeaux"; VANITY NAME: "jaymezlonshank2deep"; AND FACEBOOK ID: 100006101828983 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | 5:20-mj-38 **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

State of South Dakota    )
                                           ) ss
County of Pennington    )

I, Erik K. Doell, being duly sworn, state as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation (FBI) currently assigned to the Minneapolis Division – Rapid City Resident Agency. I have been employed with the FBI since February 17, 2009. I am currently authorized to investigate matters involving crimes committed within Indian Country as defined in 18 U.S.C. § 1151, including murder, in violation of 18 U.S.C. § 1111.

2.     I am aware that 18 U.S.C. § 1111 criminalizes murder. I am also aware that 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(B) criminalizes conspiring to distribute methamphetamine.

3.     I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc.

("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachments A and B.

4. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user IDs.

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that evidence of violations of 18 U.S.C. § 1111, murder, and 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(B) conspiracy to distribute methamphetamine is present in the following Facebook account user: USERNAME: "Mike L. LeHeaux"; VANITY NAME: "jaymezlonshank2deep"; AND FACEBOOK ID: 100006101828983 (also referred to in this affidavit as SUBJECT ACCOUNT). There is also probable cause to search the information described in Attachment A for evidence, contraband, or fruits of these crimes, as further described in Attachment B.

6. The facts set forth in this affidavit are based on my personal knowledge; knowledge obtained from other individuals, including other law enforcement officers; interviews of persons with knowledge; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience. This affidavit contains information necessary to support probable cause for this application and does not contain every material fact that I have learned during

the course of this investigation; however, no information known to me that would tend to negate probable cause has been withheld from this affidavit.

## **PROBABLE CAUSE**

7.      On January 3, 2020, at 1:23 a.m., I received notification of a homicide occurring at a residence in Pine Ridge, South Dakota.  The victim, Casey Weston, a/k/a/ Casey Long, was residing at the residence with his girlfriend, Kehala Thomas and Michael Lebeau.  The shooting occurred around 12:35 a.m.  Kehala Thomas, Michael Lebeau, Kayla Eagle Bull, Benjamin Lyndon Bacon-Wilson and Stan Garnier were also present in the home at the time of the shooting.

8.      At 12:36 a.m. Oglala Sioux Tribe Department of Public Safety dispatch received the first call regarding the shooting.  Officers responded to the scene and found the victim perishing inside the home and a female, later identified as Kehala Thomas holding him.  Weston was shot through the closed front door of the house.  There are multiple bullet holes in the door.  The body was located to the left side of the door.  Law enforcement observed several pools of blood near the body.  There were also shell casings outside of the home.

9.      The coroner called a time of death shortly after law enforcement arrived and law enforcement removed the females from the home.  The coroner removed Weston's body and an autopsy was performed.  The preliminary result of which was a possible cause of death due to a single gunshot wound which penetrated the victim's lung and aorta.

10.     According to witnesses present at Lebeau's house, just prior to the shooting on January 3, 2020, Keshia Hayes and Dani Jo Brown arrived at the

residence in Hayes' green Chevrolet pickup. They said Hayes and Brown entered the house and engaged in a short verbal argument with Mike Lebeau regarding money and drugs. Although several witnesses denied Lebeau was at the house at the time, Lebeau confirmed in a text message to me that he was in the house at the time of the argument and the shooting. Hayes and Brown also confirmed Lebeau was present in the house for the argument.   Brown and Hayes left the house after the argument with Mike Lebeau. Almost immediately after they left, people within the house heard loud knocking/banging from the outside. Weston approached the door and was fatally shot.

11.   According to Brown, she went over to Lebeau's house to smoke cigarettes around 9:30-10:00 on January 2, 2020. She asked him about money he owed Hayes for drugs and he told Brown that Hayes needed to get it herself. Brown left and went back to Hayes' house. Brown said she believed Lebeau "ripped off" Hayes of $50 and they went back to Lebeau's later that night to collect the money. Brown later admitted that she had set the deal up the drug deal between Lebeau and Hayes. Brown initially lied and said it was just her and Hayes who went back to Lebeau's later that night, but later in the interview she apologized for lying and said Ricky Bagola also went with them. She said that she and Hayes went into the house, Weston opened the door for them, and she claimed that Lebeau yelled at them immediately and then they left. Hayes and Brown then returned to the pickup and told Bagola that Lebeau yelled at them. Brown claimed Bagola approached the trailer and knocked on the door, then returned to the pickup and they left. She said Bagola tried to call Lebeau via Facebook, but was unsuccessful. She claimed the truck had bald tires and

they got stuck near Lebeau's house so they had to drive in reverse away from the residence. Brown claimed that Lebeau probably shot up his own trailer and that Weston was Lebeau's "doorman."

12.     I also interviewed Hayes and she said that on January 2, 2020, Brown said she could "score" methamphetamine. Hayes gave Brown $100, Brown left and then later returned to Hayes' residence with the drugs. Hayes said Brown had been "shorted" and only had $60 worth of methamphetamine. Brown messaged Lebeau about the issue and Lebeau said Hayes would have to go to his house and get her money back. She believed they went back around midnight. She drove her pickup and Ricky Bagola, her boyfriend of about a month, and Brown rode with her. Hayes said she and Brown went to Lebeau's door, knocked and were let inside by Weston. She said there were others in the house in various locations. Hayes claimed she and Brown stood at the door and Lebeau yelled at them. They went to leave and Weston opened the door for them. They went to the truck and told Bagola that Lebeau had cussed at them, Bagola got out of the pickup and said, "Well I'll try to get the money back" and approached the house and pounded on the door. Hayes claimed that after knocking on the door, Bagola did not enter the house, rather he returned to the pickup and they left, and went back to her residence and "got drunk." Hayes claimed not to have heard shots and that she did not own a gun. She also did not think Bagola had a gun. She saw people "strolling" at the time but did not take notice of whom they were. Hayes said they collectively decided to just "take a loss" on the money Lebeau owed them.

13.     Notably, Brown admitted she used Facebook messenger to

communicate with Lebeau regarding the drug exchange, which appears to have ultimately led to Weston's murder.  I know that also means that Lebeau was using Facebook messenger.

14.   Hayes' and Brown's version of the events do not comport with the video footage of the area I obtained from a nearby bank.  Per employees of the bank, their cameras were not corrected to account for the time-change so they show times one hour ahead of the actual time.  In addition, when I compared dispatch times to camera times, it appears that the camera time is approximately 3 minutes ahead of dispatch time.  I believe dispatch time to be the more accurate time.  Based on that, I have corrected bank times in this affidavit to account for being an hour and three minutes ahead of dispatch.

15.   On the bank's video, I observed the pickup pull up at Weston's residence at 12:34 a.m.  At 12:38 a.m. it appears the pickup starts because the lights came back on.  At 12:39 a.m. the pickup drives back by the camera.  At 12:40 a.m. the first call to law enforcement was made.  Stan Garnier had called OST Sgt. Ladimer Clifford and Clifford called into dispatch to report the shooting.  The timing is consistent with an occupant of the pickup shooting into the house and then fleeing the scene.

16.   It should be noted, that my investigation has rendered information from various witnesses which is inconsistent.  I have set forth that information in other search warrant affidavits related to this murder.  Nothing in this warrant is meant to give the court the impression that any particular witness's claims are the true and correct version of the events, but are the facts various witnesses provided to me, relevant to probable cause to search Lebeau's Facebook account.

As my investigation has continued, it has evolved, and the facts and suspects have changed. Additionally, future search warrants may contain information different from that set forth in this affidavit based on information I have received and will receive from other witnesses. All facts set forth in this affidavit and other affidavits are based on the information I have at the time of the affidavit and changes are based not on my inconsistencies, but based on the information provided to me by witnesses.

17. Further, I have learned the following from Special Agent Dan Cooper regarding Lebeau's drug distribution activities: Lebeau has had multiple contacts with Oglala Sioux Tribe Department of Public Safety since December 2017 involving controlled substances. On October 24, 2019, OSTDPS officers located 34 grams of methamphetamine on Lebeau during an arrest. When interviewed in February 2018, Lebeau admitted to "middling", or arranging, methamphetamine deals. Several persons have identified Lebeau as a source of methamphetamine.

18. On December 8, 2017, Lebeau was a passenger in a vehicle that was stopped after three juvenile girls reported the car had been following them. A different passenger had weapons by where he was sitting. The officer had Lebeau exit the vehicle and could smell alcohol coming from Lebeau. He was arrested for intoxication. During a search incident to arrest, $880 currency was found in his pockets and a small Ziploc baggie of meth (field test positive) was found safety-pinned to his boxer shorts.

19. On March 16, 2018, OSTDPS Officer Archambeau stopped a vehicle driven by Uriah Lafferty. Lafferty was arrested for driving intoxicated. During a

search of his vehicle, Officer Archambeau located a bindle of approximately .3 grams of meth in the air vent. When asked where he got the bindle, Lafferty nodded his head in the direction of Lebeau's residence.

20. Using the info from the March 16 stop, on March 17, 2018, a tribal search warrant was executed at Marlin Lebeau's residence. Three other persons in addition to Lebeau were present. Law enforcement located 9 plastic baggies containing meth (testing confirmed meth – 3.41 g total), a folded paper bindle containing meth, digital scale, used & unused plastic baggies, a flip-open cell phone, and a Smith & Wesson revolver. These items were found in either common areas or in Lebeau's belongings. When logging the phone into evidence, law enforcement found a baggie of apx. 1 gram of meth inside.

21. On December 20, 2018, a confidential source reported Lebeau was selling meth in Kyle and Justin Garrett sold for Lebeau.

22. On February 24, 2019, OSTDPS Officer Derek Puckett was patrolling in Pine Ridge. He saw a vehicle wherein Lebeau was the passenger. Puckett was aware Lebeau had an active warrant. He conducted a traffic stop of the vehicle and arrested Lebeau. Puckett smelled the odor of burnt marijuana. Lebeau reported he and his niece Jaden Lebeau smoked a joint in there earlier and she took the roach. Officers searched the vehicle and found marijuana paraphernalia, straw scoops, and wrapping papers. In the purse of a juvenile girl (apx. 5 or 6 years old – Lebeau's daughter) law enforcement found 8 paper bindles of meth and two baggies of meth along with $1668, a tablet, USB drive, three phones and 3 empty Ziploc baggies. Lebeau's daughter told the officers her dad told her she was not supposed to give up her bag. She was crying and

upset when officers took it.

23.     Agents interviewed Lebeau in February, 2019, he reported the driver of the vehicle (Matthew Watkins) put the meth in Lebeau's daughter's purse. Lebeau reported meeting Watkins a few weeks earlier through his cousin, Mark Hopkins.  Lebeau agreed to help Watkins sell meth in Kyle and Rapid City as a middleman.  One of the people Lebeau middle deals with was Jaden Lebeau. Lebeau reported getting meth from Hopkins and admitted to being involved in dealing for about 1 year.

24.     Based on my training and experience, as well as confirmation that Lebeau used Facebook to engage in a drug deal with Brown, there is probable cause to believe Lebeau utilized the SUBJECT ACCOUNT to communicate regarding drug deals.   Additionally, there is no indication from any of my investigation that Lebeau's dealing with Brown was different from with other persons to whom he was dealing.

### INFORMATION ON FACEBOOK

25.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows individuals to specifically communicate with another person through a Facebook application called "Messenger."  In my training and experience, people who engage in online criminal activity often also utilize Facebook to meet victims and other offenders and to chat.  Even if Facebook was not utilized in the chat at issue, there is probable cause to believe there will be evidence regarding murder within the target Facebook account.

26.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

27.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

28.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

29.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By

adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

30.    Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

31.    Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or

video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

32.    Facebook users can exchange private messages on Facebook with other users.  These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook.  These chat communications are stored in the chat history for the account.  Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

33.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

34.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

35.    Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.    Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.   The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.   The activity log is visible to the user but people who visit the user's Facebook page cannot viewed it.

36.    Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

37.    The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page.   Gifts cost money to purchase, and a personalized message can be attached to each gift.   Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

38.    Facebook also has a Marketplace feature, which allows users to post free classified ads.   Users can post items for sale, housing, jobs, and other items on the Marketplace.

39.    In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.    When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may         appear         on         the         user's         profile         page.

Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

40.   Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

41.   Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications,

including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

42.    As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the user accessed or used the account. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining, the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.    Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-

location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

43.   Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED
## AND THINGS TO BE SEIZED

44.   I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## REQUEST/JUSTIFICATION FOR

## ORDER OF NONDISCLOSURE

45.    The United States respectfully applies for an order of nondisclosure to Facebook under 18 U.S.C. § 2705(b) regarding the following account user: USERNAME: "Mike L. LeHeaux"; VANITY NAME: "jaymezlonshank2deep"; AND FACEBOOK ID: 100006101828983 (also referred to in this affidavit as SUBJECT ACCOUNT).    The United States is seeking this search warrant for user information, including all names, addresses, IP addresses, including historical, telephone numbers, other email addresses, information on length and types of services and any means of payment related to these accounts under the authority given by 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A).   Based on § 2703(c)(3), the United States is not required to provide notice to the subscriber.   Under § 2705(b), the United States may apply to the court for an order commanding Facebook not to notify the subscriber of the existence of the search warrant.   The court may decide what length of time shall apply to the order of nondisclosure if the court determines the notification to the subscriber could result in one of the five factors listed in the statute, which includes destruction of or tampering with evidence.   18 U.S.C. § 2705(b)(3).   The basis for the request is that such disclosure could cause any person with access to the accounts, or any related account or account information, to tamper with or modify the content or account information and thereby destroy or tamper with evidence and otherwise seriously jeopardize the investigation.   Especially due to the ease of access to Facebook, its content can be modified by persons with internet access and sufficient account information.   As such, the United States

respectfully requests this Court enter an order commanding Facebook not to notify the user of the existence of this warrant.

## REQUEST FOR SEALING

46.    I further request that the Court order that the matter be sealed until further order of the Court.   The matter is an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.   Accordingly, there is good cause to seal the matter because premature disclosure may seriously jeopardize the ongoing investigation.

## LIMIT ON SCOPE OF SEARCH

47.    I submit that if during the search, agents find evidence of crimes not set forth in this affidavit, another agent or I will seek a separate warrant.

## CONCLUSION

48.    Based on the forgoing, I request that the Court issue the proposed search warrant.

49.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).

50.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Special Agent Erik Doell
Federal Bureau of Investigation

SUBSCRIBED and SWORN to
in my presence

_____ by reliable electronic means

this __4th__ day of ~~February~~ March, 2020.

_____
DANETA WOLLMANN
U.S. MAGISTRATE JUDGE

## ATTACHMENT A

## Property to Be Searched

This warrant applies to information associated with the following Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California:

- USERNAME: "Mike L. LeHeaux";

- VANITY NAME: "jaymezlonshank2deep";

- AND FACEBOOK ID: 100006101828983

## ATTACHMENT B

## Particular Things to be Seized

### I.      Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f).   Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

All contact and personal identifying information for Facebook user with USERNAME: "Mike L. LeHeaux"; VANITY NAME: "jaymezlonshank2deep"; AND FACEBOOK ID: 100006101828983.

(a)     Including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)     All activity logs for the accounts and all other documents showing the user's posts and other Facebook activities;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

2

(d)     All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)     All "check ins" and other location information;

(g)     All IP logs, including all records of the IP addresses that logged into the accounts;

(h)     All records of the accounts' usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)     All information about the Facebook pages that the accounts are or were a "fan" of;

(j)     All past and present lists of friends created by the accounts;

(k)     All records of Facebook searches performed by the accounts;

(l)     All information about the users' access and use of Facebook Marketplace;

(m)   The types of service utilized by the user;

(n)   The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)   All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the accounts;

(p)   All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook accounts, including contacts with support services and records of actions taken.

**II.    Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 1111, murder, from **January 1, 2019 to present**, including, for the Facebook user identified on Attachment A.

**III.   Information Regarding Search Warrant Compliance by Facebook:**

Facebook shall disclose responsive data, if any, by sending to:

> Special Agent Erik Doell
> Federal Bureau of Investigation
> ekdoell@fbi.gov
> 3600 Jet Drive
> Rapid City, SD  57703
> (605) 872-4119

Facebook shall use the United States Postal Service, another courier service or to disclose the responsive data or shall make it available on its law enforcement portal.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct.   I am employed by Facebook, and my official title is _____.  I am a custodian of records for Facebook. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Facebook, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b.      such records were kept in the ordinary course of a regularly conducted business activity of Facebook; and

c.      such records were made by Facebook as a regular practice.

I further state that this certification is intended to satisfy Rules 902(11) and (13) of the Federal Rules of Evidence.

_____          _____
Date                                          Signature

6

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
for the
District of South Dakota

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE FOLLOWING FACEBOOK USER: USERNAME: "Mike L. LeHeaux"; VANITY NAME: "jaymezlonshank2deep"; AND FACEBOOK ID: 100006101828983 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | )<br>)<br>)  Case No. **5:20-mj-38**<br>)<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the District of ___South Dakota___ *(identify the person or describe the property to be searched and give its location)*:

See **ATTACHMENT A**, attached hereto and incorporated by reference

I find that the affidavit, or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Evidence of a crime in violation of 18 U.S.C. § 1111 & 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(B) as described in **ATTACHMENT B**, attached hereto and incorporated by reference.

I find that the affidavit, or any recorded testimony, establishes probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before *March 18, 2020* *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to ___Daneta Wollmann___.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30).*          ☐ until, the facts justifying, the later specific date of _____.

☐ I find that good cause has been established to authorize the officer executing this warrant to not provide notice prior to the execution of the search warrant, i.e., "no knock".

Date and time issued: **3-4-2020  9:30 am**          _____
                                                                            *Judge's signature*

City and state:   ___Rapid City, SD___          ___Daneta Wollmann, U.S. Magistrate___

cc: AUSA Collins + Agent - slt

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>5:20-mj-38 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

**Certification**

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____                   _____
                                                          *Executing officer's signature*


                                                          _____
                                                          *Printed name and title*